Case No. 09-1557, Roberta Kramarski v. The Board of Trustees of the Village of Orland Park Police Pension Fund. I wonder if the attorneys on this case would step up and identify themselves for the record, both of you. Jeffrey Alter with Anne C. Osmond, wrote of Novak Macomb, representing Roberta Kramarski. And Jeffrey Goodloe with Richard Bremer and Associates, on behalf of the defendant Natalie, the Board of Trustees of the Village of Orland Park Police Pension Fund. I think both of you gentlemen have appeared here before, have you not? I have not, Your Honor. You have not. Not in front of this panel, Your Honor. But in this court. Yes. Okay, so you know generally the marching orders. That microphone you have in front of you is not an amplifier, it simply records your words for posterity. Which incidentally are available, as you may already know, on the Internet. All appellate oral arguments are now accessible. On the Illinois Supreme Court website. Accessible immediately. I mean you can go out afterwards, for what it's worth, and listen to how you did. If you're halfway interested in that. Fifteen minutes for each side. You may save out from your fifteen any portion you wish for a response. And I think you can safely assume that we're familiar with the facts and your briefs. Okay, Your Honor. If I may then have a couple of questions. I don't really intend to make you nervous with this, but I am curious to see how you'll handle the diagnosis of approximately 19 doctors in this case. An oral argument. I'm prepared, Your Honor. As you said, I would like to save a couple minutes for rebuttal. You may. You are familiar with the facts of this case, and I want to focus on the issue. The primary issue that we have on appeal is the decision of the board denying Ms. Komarski an in-line of duty disability pension. In-line. In-line of duty. You want to focus on that rather than just disability? Well, I would submit that hand-in-hand. However you wish to focus your oral argument is up to you, counsel. I would like to focus on the disability, but primarily focusing on the issue that the disability resulted from an act of duty. And that goes back to what the act of duty that she was performing at the time of her injury. The testimony was clear, and as you said, you're familiar with the facts of the injury itself. It was a mandatory training session. A training session of an ASP baton training session in which she testified that she was injured. Now, the decision of the board was denying disability based upon credibility issues. Dr. Tudor questioned whether the incident ever occurred. And Dr. I'm sorry. And consequently, you have to deal with Marconi, with which I particularly am well acquainted, since I wrote the appellate decision that was reversed in Marconi. And you have a psychologist or a psychiatrist testifying that he doubts that the event transpired. You don't have any eyewitnesses to that event other than the testimony of the claimant herself that it took place. You have some collateral indicia of it through Dr. what is it, Lieutenant Knoll's letter to the conductor of that drill to take it easy. But that didn't specifically refer to the drill in which the injury, for which the injury is claimed. Now, why isn't that enough sufficient? In addition, you have Oblanski saying she's a malingerer. Now, I'm not saying she's a malingerer. I'm not saying that the incident never occurred. But I'm not the juror in this case. You know, I have to deal with the fact that there's a manifest way to the evidence standard, and if there is any kind of testimony that lends some gravitas to what the police board decided, that under Marconi, our hands are pretty narrow. I won't say they're tied, but they're narrowly confined. And I would submit to you that it is the manifest way, and if you look at the entire record, which is rather lengthy, 2,600 pages, that the manifest way of the evidence, when looked at entirely, would support the reversal of the board's decision. Primarily, let me take it back to you. I hate to interrupt you again, but this is important, because if we are going to go along with what you're saying, we have to figure out a way, it seems to me, to distinguish this case from other cases. The critical sentence, one of the critical sentences in Marconi is this. It's at page 534 in the reports. If the record contains evidence, now note, evidence is not modified. It doesn't say substantial evidence. It doesn't say any evidence. It doesn't say some evidence. It simply says if the record contains evidence to support the agency's decision, that decision should be affirmed. And that's not inconsistent with Wade. No. And they went further in Marconi to say an administrative agency decision is against the manifest way only if the opposite conclusion, and they used the phrase, is clearly evident. That's our standard of review that we are now using. You could argue, and I think you are being a very able lawyer, would say that from your vantage point, Marconi lifted the bar somewhat with respect to the review of administrative agency decisions, particularly if they're pre-police pension boards. So what precisely among the facts, the core facts, would you suggest I or we have to put into an order or an opinion which would make it possible for us to distinguish this under the Marconi standard of review? I would submit primarily starting with the incident itself. The baton incident? Well, the evidence, whether it was 30 seconds long, whether it was two minutes long, there's testimony going through the spectrum. One puts it at 30 seconds. The conductor of that test claimed very light physical contact. There's also testimony saying that any force used was at 20 out of 25 percent level general. Similarly, there's also some testimony, I believe, that there was no actual contact. And that testimony in itself is inconsistent with Ms. Kramarski's testimony. Yeah, but fine, but we don't go to Ms. Kramarski's testimony under the Marconi decision. We focus on the testimony that supports the board. If there is evidence in the record supporting the board, we are not in a position to reevaluate. But the evidence was impeached, and that's what I was trying to say about Officer Hosein. His testimony itself was impeached by the second instance from Lieutenant Dole regarding the letter. There is vile physical contact that's occurring. Is impeachment enough? I would submit that it is. Well, first of all, it's not really very, it's not flat-out impeachment, because that letter doesn't refer to this particular training session. It refers to a general practice. That doesn't preclude this particular session from not having that same defect or approprious conduct that was criticized in the Noel letter. But taking it one step further beyond that, there was no evidence to contradict any histories regarding any other cause of the cervical condition. From the second she went to her first initial doctor, Dr. Rook, every history was consistent with how the injury occurred to her. Except that there is evidence of a preexisting injury diagnosed in 1989. It's in the record. And if that injury was not exacerbated by this baton drill, then this was not an injury incurred in the line of duty. Now, you may have an argument that it was nevertheless an injury that may have rendered the claimant disabled, which is the second tier of your appeal. You're basically, that's where you're the cross happily. And it may be very relevant as to that. But it doesn't really help you much in establishing your admittedly uphill problem in seeking reversal under a manifest way to the evidence theory. But that's the point exactly, is this alleged 1989 accident doesn't exist in the record. There's no evidence to support that other than the doctor, their doctor stating that this had occurred. Ms. Komarski testified that the injury that she had in 1989 was to her lower back. The medical records that their doctor refers to alleging this 1989 were admitted as evidence. And there's no record of this 1989 accident to her cervical condition. It's an allegation that's not supported by the evidence and directly contradicted by Ms. Komarski. And that's a theme throughout this, is that there's a lot of allegations, but they're not supported by the doctor. There are problems with Mercier's testimony. I'm talking about some independent indicia that there was a previous diagnosis of a back injury or a cervical injury before 1996. And I submit to you that there is no documentary evidence in the record to support any preexisting condition. Even in Phillips' report? Even in Phillips, there was no preexisting condition, even in Dr. Phillips' reports or his testimony. Dr. Mercier referenced in his report, which again, the basis of this entire opinion, is based upon a theory that she had an EMG nine months before the accident. We've shown the evidence reflects that that's not what happened in those days. There's something about 1989, not nine months before. There's something about a diagnosis in 1989. Again, that's an allegation by one of their examining doctors that's not based in any evidence submitted into the record. The evidence that was submitted was her testimony saying in 1989 she had a car injury and it was to her lower back. The medical records that their doctor is saying or referring to about a 1989 cervical condition do not exist in the record. They are not in the subpoenaed records from Dr. Rook. It's not there. It's an allegation that's unsupported. And that's why I'm saying the decisions against the manifesto, because there's a lot of allegations that are in the decision that are not supported by the record. They're going on a credibility opinion. Credibility is a very subjective standard because they're going on credibility because the objective evidence in the record does not support the decision. What are you talking about? Because isn't the testimony of these doctors part of the record? You're talking about what underlying proofs these doctors submitted? Is that what you're talking about? Primarily their decision is based upon Dr. Mercier's report. All the other doctors agree that she was disabled. Dr. Mercier is the only doctor from an orthopedic physical standpoint who said that she was disabled. And I think I've shown, and you're well aware in the briefs, that Dr. Mercier's opinion is not credible. It's worthless. It's based upon incorrect evidence. There's nothing to substantiate his opinion. I think we've pretty much gotten to your point with respect to that. Can I shift the focus for a minute? Sure. And that's to your argument that the hearing was far from fair and impartial. Is there anything in the record that we could look to that will give us an indication of why two members of the board did not vote? In the record, we can surmise perhaps that because there was an allegation that they may have withheld their vote for that reason. But that's just a surmise. Is there anything in the record that indicates why they did not vote? There is nothing else in the record. Along that line, is your argument that assuming they were biased, they didn't vote? Are you saying that they contaminated the panel by simply being seated at the hearing? I absolutely agree that they infected the entire panel. But they could infect the panel whether they sit at the hearing or not. Why is there so much of a greater risk that they're infecting the panel when they're sitting there, as opposed to, don't you think they hang their coats in the same coat room with the rest of the panel, even if they didn't sit in at the hearing? But they had the opportunity to intimidate and question Ms. Komarski during the hearing. And the questions that were posed by them, I feel, were very prejudicial. And their minds were made up prior to even walking into that courtroom. And that was the point by asking them to be recused, is that their minds were made up before they even walked into the courtroom about their own feelings regarding Ms. Komarski. And I do believe, and even the comment that I referenced in my brief about how he feels, that's just indicative of the nature of the relationship between them. My recollection with respect to Danko, you cite Danko in support of your bias and prejudice argument. Do you remember what the facts were in Danko? That's the case you cite first for the possibility of a fair and impartial hearing. That the deferential standard isn't controlling when we're confronted with a board that may not be fair and impartial. And Danko was the issue with the chief there had an issue with the officer. I guess they had fire problems together that were well documented between them. And that was brought up as an issue. One of the reasons I lend some credibility to this argument is if you look at the findings of fact that were set out by the board here, and they total 100, although not all 100 are findings of fact.  Fact 95. On February 28, 2001, the applicant appeared unable to sit for more than three to five minutes. That was from the record. This was in support of her argument about disability. Then they say this, curiously, this inability to sit comfortably was not observed by the board during the hours of hearings before it. And I was just wondering whether you had ever encountered in your traversal of administrative hearing records where a board was actually basing some of its findings of fact on what occurred during the course of the hearing before it. No, Your Honor, I'm not aware of that. They say, curiously, this inability was not observed by the board during the hours of hearing before it. I wonder if they ever made this known to the applicant so she could attempt to rebut it. It was not, Your Honor. It was not brought up during any of our hearings. And if you recall, there were numerous hearings that were held in this matter over numerous evenings to bring this matter to resolution. There was a flavor to this case which would seem to indicate, let me put it that way politely, a flavor to the board's opinion which would seem to indicate that they had very strong feelings about this particular applicant's, the merits of her case. And I would agree, and that was well before going into it, even before the hearing actually started. I mean, that's a speculation that could also fit with the further facts that this particular claimant was not particularly a not inconsequential officer in this particular case. She was not seeking a pension, but rather someone who raised some problems with the department that she was working for and with the board as well. But nevertheless, it's still speculative, isn't it? But speculative, but also supported by that there were other allegations and other lawsuits that were filed against them to support this. And that's why the refusal was made, because they were named in the other lawsuits. And their opinions were decided before they even stepped into that courtroom against her. And that's what the case law is supposed to protect. But it raises, policy-wise, the question to what extent can we as a reviewing court give full expression to what may very well be factors that may exist but to what may not. And to what extent should those factors be treated as if, instead of that they may exist, that they do exist. And that's always the problem that a reviewing court has, weighed against the stability of the process, the revenues involved in the process, and the standards of review that are set up to determine how far our authority goes in making our own evaluations that are in line with the standards of review that have not been conclusively determined so as to meet the standards of weight as opposed to the standards of marketing. I would submit to you that the conjunction between the issue of the recusal and the decision itself in my brief, as I pointed out to you, the unsubstantiated allegations that the board rendered in its decision, the combination of those two are clearly reflected that the decisions of the board have gone a lot of their way to deny Ms. Komarski a disability pension. And I think that was made relevant on a number of occasions. Again, the whole issue with the recusal only supports that step even one step further. The final point, the trial judge in this case found in your favor with respect to disability, based primarily, as I understand it, on the failure of the board to even consider this surgery that she had. Correct. I take it you approve of that portion of the trial court's opinion. I do, Your Honor. I have a question about that, too. If one chooses elective surgery, let's say if one gives credence to Dr. Milgrom's testimony, for example, that the surgery was not necessary, or for that matter, to what the board alleges to have been Dr. Phillips's position, that the surgery was not necessary but demanded by the claimant, and as a result of the surgery, a disability is created by the surgery itself, would that entitle, if there was no other history to that disability, other than the elective surgery itself creating the disability, would that be grounds for a non-line-of-duty disability pension? Taken it just in that realm, I would submit that if the disability exists, regardless of its cause, regardless of its cause, so to speak, self- inflicted. No, no, you're not agreeing with that, nor am I. But there is evidence to add to that, which has to be clarified, because if that is the evidence, if there is such evidence, then that becomes a resting basis for the police board's determination that she's not entitled to money. I don't believe that the law differentiates in its standard that it says disability. If it's clear that she has a disability, or a claimant has a disability. Yeah, but that assumes, does it not, that a spinal fusion from surgery leads to automatically a presumption of disability? I wouldn't say that that's what we're arguing. I'm saying in her case, after undergoing three functional capacity evaluations, she wasn't allowed to return back to police work. The trial court seems to focus on the mere fact that she had this surgery, leading a very invasive surgery. We're all, pretty much, at least the older generation is familiar with this. You don't have to face this right now, Mr. Abler, nor does your opponent. But as we age, these kinds of surgeries become much more common. The trial court seemed to assume that just having the surgery is a sign of disablement. And that the fusion, although it probably corrects the disability to a certain extent, doesn't erase the disability. At least that's the impression you get. The surgery itself was prima facie evidence of disability. When in fact, it would seem that if somebody testified that the cervical fusion was stable, in other words, that the fusion was a success, can there be a prima facie case that the person remains disabled? I don't believe so, and I think even Dr. Phillips said that potentially someone who undergoes a cervical fusion could return back to work. In this case, she, after undergoing the functional capacity evaluations, objectively found valid. Isn't there some indication in the record, for example, that under the discography of the surgery, if there is a triple fusion, for example, it will limit movement to a greater extent than would be the case if you simply had some bulging discs, moderately bulging discs, that wouldn't require that surgery. So that in that event, the surgery may correct on the one hand, you know, certain problems with those discs, but because of the triple fusion, create limitations on physical movement that would disqualify somebody from doing certain kinds of police work. Unfortunately in this situation it did because it restricted her limitations of motion and strength to a significant degree. The idea behind the surgery was to eliminate her pain, discogenic pain that was documented in the discogram that she underwent. We have countless examples of police officers who have been recommended for light duty because of surgical intervention. They haven't been declared disabled for pension purposes, they've just been declared to be eligible for light duty for a period of time. And then they're reexamined every six months or so, and at some point a doctor has to fish or cut bait and say, this person is now able to return to the full panoply of duties of a police officer or continue light duty at the forbearance of the police department or take a disability pension. Now that never happened here because of other circumstances. Yeah, a lot of other circumstances were undergoing at that same time as well. Yeah, but can we just assume that because she had the surgery that that is unrebuttable evidence of disability? Or could the board reasonably have assumed based on all of the medical testimony going back and forth that she was not, quote, disabled, unquote, in terms of the pension? Well, I don't believe there's any evidence to support the board's decision that she was not disabled. Planofacial evidence of the cervical fusion by itself I don't think is the issue. I think the resulting treatment and maximum medical improvement position that she received after that, after the surgery, showed that she was unable to return back to police work. Okay, I understand your position. Okay, I think you need to sum up because we need to hear, we have another case this morning and we need to hear from your opponent. I appreciate your time and at this point we would ask again, we submit that you review evidence in its entirety. We submit that the support for the board's decision just isn't in the record. It's not supported by the record. There's a lot of allegations, but allegations that are unsupported by the record are not true. The evidence doesn't support their decision. I would submit that the decision of the board was against the manifest weight of the evidence. When looking at the totality of all the medical records, all the testimony, and all the documentary evidence that are contained in the record, that the decision does rise to the standard that an opposite decision is clearly apparent in this case. Okay. Good morning. Let me ask you a question. Would it be within our power as a reviewing court to determine that the board owes the world an explanation as to why two of its members did not vote in this case after they sat through all of the testimony and actually participated at some point in the questioning? Well, do you owe the world an explanation for that? I'm not sure if you owe the world an explanation for that, and I don't know. Well, you have two strangers, in effect, sitting on the dais taking testimony and participating in the hearing who don't vote on the result. They now have become strangers. What were two strangers doing at that hearing? Non-participants. I don't know. Why were they participating? And supposing, in fact, two people off the street came and joined at the hearing, would you say that the hearing is problem free simply because the three who vote are properly authorized to do that? Can they take anybody off the street to sit with them? They cannot, Your Honor. Then don't you think an explanation is due as to why these two members who were transformed into strangers by their non-participation, what happened? I don't know the answer to that. Neither do we, but are we entitled to know? And is it relevant to his issue that he raises, that the board showed bias? It's absolutely not relevant to the issue. And let's assume for a second that it was counsel for the pension board at the time who said, you know what, because he raised the issue, how about you guys just don't vote on the issue, and then that will put the whole bias issue aside. It's a bad argument for the pension board anyways, because as Your Honor said, those two simply being there on the panel and participating in it, they would have infected the board, but they didn't participate in the hearings, they asked questions. So they were fully participating as far as Mr. Adler was concerned, assuming Mr. Adler was participating there, I don't know whether he was or not, but you've got five members of the board sitting there and you're trying to analyze the chances of your case based in part on their questioning, just as he's wondering now where we're going to come out. And then suddenly, and two of them have been accused of bias, one of them denies it and says, on the record, on the record, that case was thrown out in federal court, which according to Mr. Adler was a misstatement of what actually happened. It was settled. It was settled. The case was settled. That's a lot different than being thrown out. Correct. Okay. And then he continues to participate in the hearing, and then at the end when the vote comes, he says nothing. He doesn't say pass. He doesn't say, based on the allegations against me, I'm going to recuse myself from consideration in this case. That would have solved the matter. Right. Okay. He says nothing, nor does the other person say anything. Correct. Are we entitled to know, and would it be beyond our powers to remand this case to the board for an explanation as to why they did not vote? It's certainly not beyond the court's power to remand the case. You guys can, your honors can certainly remand the case. That is within your power under the law to do that. But I think that the issue is, before we even get to that, because it's a bad argument anyways to say that because they didn't vote, it kind of renders the bias issue moot. But what has to happen is that the plaintiff has to present more than just the possibility of prejudice, and that's all that the plaintiff did in this case. And the plaintiff has to do more than that. They have to actually show, they have to put forth evidence to prove that these two trustees were biased. Otherwise, it really doesn't matter. And they did not do that. And we look at that by either we look at the evidence put forward by the plaintiff to show that, well, at this time this trustee had made these comments and they're proven on the record, or your honors have to look through the 2,600 pages, page by page of this record. I don't think we have to do that. All we have to do is to go to our own canons and pick out a couple of phrases that we're bound by, and one phrase that comes to mind readily is the appearance of impropriety. There doesn't have to be impropriety. All there has to be is if we are in a position where we may give the appearance of impropriety. If I were to say to, I forgot your name again, I'm sorry. My name? Yeah. Jeff Goodloe, your honor. Mr. Goodloe, how's your wife and kids? No kids. I saw your wife at the supermarket the other day. She looked well. And I talked to a couple of your children. They're really coming along well. Just for the record, this is part of your hypothetical. This is my hypothetical. Would Mr. Adler have some reason to be concerned, even though he might have been innocent on my part to have said that? He may have a reason to be concerned, but that's not enough. Simply the appearance, the allegation is not enough. There has to be some proof, and that's where we go back to the Danko v. Harvey case, where if the plaintiff had simply come forward in that case and said, the chief in this case is biased against me, which is exactly what the plaintiff did in this case. They said, trustee Dargan is not going to be fair. Trustee Bianchi are not going to be fair. That's not enough. The court looked at the actual record, and they said, you know, the record bears out that the chief is not fair in this case because the chief was the one who brought the disciplinary  You're not going to get anything from the pension board. And then he called the plaintiff an expletive omitted liar during the hearing. So there's actual evidence. And the same in Williams v. Morton Grove, which the first district just handed down. The point is, you know, this question about the two members who abstained, obviously you can have abstentions that don't raise any eyebrows at all. You can have five members of a board sit. They can hear the testimony. And two of them may say after hearing this testimony, I'm going to abstain. And as long as there is a quorum left, unanimous, you know, you say there's no problem. On the other hand, supposing you analogize that to a jury, a fact-hearing jury, where jurors who are permitted, you know, to ask questions, and some judges permit them to ask questions to the parties. And you have two jurors sitting in the jury box asking all kinds of questions during the trial of the parties and of the witnesses. And some of those questions perhaps pointed. Turns out those jurors are subsequently found to be disqualified either because of bias or because they lied on their jury cards or what have you that disqualified them. They're then replaced by alternates. Do you think that the parties, the loser in that case, is stuck and has to basically sit in silence and accept the verdict from this replacement jury in the face of the fact that there were two jurors? Who participated and then found to be disqualified? I would submit that I don't know the bottom line answer to that. But I would submit that it would certainly make a difference in knowing what this disqualification was all about. It may make a difference. But at the same time, your hypothetical assumes that there actually was bias. Well, we don't know, but there is some smoke here. We don't know where it's going to take us. We know that there were objections made to those two jurors. We know that one of the jurors was, although not joined as a party, was named in the factual allegations for establishing a gender-biased climate. We don't know where this is. And as far as I'm concerned, these two gentlemen are perfectly respectable and are totally without any kind of, any iota of contamination even for this panel. But there's smoke, and that's what Justice Cahill is talking about. If there is that kind of smoke and there is that kind of abstention, shouldn't we know what the facts were? But we do know that there was smoke that was raised because the plaintiff made the motion to recuse the two trustees, but the very first hearing before the pension board, the purpose of that hearing was to rule on the motion to recuse. That was the plaintiff's opportunity to vet and say, and they ruled. And they said, we're not going to recuse ourselves. And then at the end they did. But they just didn't vote. They were there, but they didn't vote. And I don't know why. The record doesn't say why they didn't vote, Your Honors. I don't know. But under the Open Meetings Act, you need an affirmative vote of three of the five trustees to make a ruling. And I, for one, am not taking the position that all five members of the board or trustees of the board have got to participate in every decision. But under these circumstances, there is enough of an open meeting to make a ruling. There is enough of an issue raised which would seem to ask for more clarification in order to determine whether their prior participation before the decisional phase of their hearing, to determine whether that creates a problem. You never really had a chance to address those points in the case that you'd like to address, because I threw you that curve right at the beginning. Well, not a curve, really. A fastball, as opposed to a softball. Proceed with the points you were going to make. Well, I guess the argument that I'll address is my argument on cross-appeal, which is that the trial court erred when it reversed the pension board's finding that the plaintiff is not physically disabled. Whether the plaintiff was physically disabled is a question of fact, subject to the manifest weight of the evidence standard. And as Your Honor said, in order to reverse all reasonable persons acting within the limits prescribed by law and drawing all inferences in favor of the pension board would have to conclude that the pension board made a mistake and that the opposite conclusion is clearly evident. And that's not the case based on the facts and the record in this case. There is medical evidence that supports the pension board's decision that the plaintiff is not disabled despite having the three-disc cervical fusion. Dr. Blonsky issued an opinion holding that the plaintiff is not disabled and that she can return to work. Dr. Mercer also issued an opinion finding that the plaintiff is not disabled as well. So there are two opinions right there that support the pension board's finding that the plaintiff is not disabled. But what about Dr. Mercer's flawed opinion since it's based on an inaccurate record upon which he apparently relied? I disagree with that. He relied on a date that was incorrect. Now, as the hearing came out, we all agreed that that date was incorrect. But his reliance on that date doesn't go, isn't germane as to whether the plaintiff is disabled or not. His reliance on that date only goes as to causation. It is only relevant as to whether the plaintiff's disability was incurred in or resulted from the performance of an active duty, i.e., the October 17, 1996, injury. So it has nothing to go towards that. And frankly, the incorrect date was actually in the record. So he didn't fabricate it. He didn't ignore it. He didn't make it up. It was just in there. So he actually reviewed the record, saw it, and he didn't know any better. He just relied on it. Well, it would have saved his testimony if the record was wrong and if that portion of the record was influential in his decision. Only influential in his decision as to causation, not as to whether she was disabled or not. Because he clearly found that any incident that may have happened October 17, 1996, the plaintiff then recovered from and was able to return to full and accurate police duty. And so those are two opinions. But I think another big issue in this case is the plaintiff's credibility. The plaintiff has a credibility issue in this case. And it really goes to the heart of the case. And the reason is this, is that it goes to the veracity of the plaintiff's subjective complaints, which form the basis of some of those doctors' opinions who found her disabled. And so if those doctors found the plaintiff disabled based on the subjective complaints of the plaintiff, which we are not to believe, then those opinions are inherently flawed. And that's the problem in this case. And there's significant amount of evidence in this case to show that the plaintiff was not telling the truth. And that the objective findings... Well, one of your doctors looked at the subjective history and said her affect doesn't match up with her testimony or her subjective complaints. But nevertheless, the factual events were consistent. The fact that the plaintiff would militate in favor of corroborating rather than denying what she said. The fact that she undertook the surgery itself bespeaks to the fact that she was in pain. I disagree with that. I think there's evidence to contradict that. Well, one of your doctors said that. Didn't Dr. Milgram say that? Dr. Milgram may have said that. Yeah, but that's just one of a number of doctors. And what's that asking this court to do is to re-weigh the evidence where there's a conflict in the evidence. And it is exactly what the court's not supposed to do when looking at administrative reviews, is to re-weigh the evidence. So long as there is competent evidence to support the board's decision. The fact of the matter is that this plaintiff started working in May 1996 and then alleged that she had this injury in October 1996. After that, she works full and unrestricted police duty for three years.  And every one of these doctors invariably comes back and says that the objective findings that we have do not correspond to her subjective complaints. There is no objective basis for it. So she goes to another doctor and another doctor. Not only that, she undergoes an EMG that says that there's absolutely no left-side cervical radiculopathy, which is directly contrary to her testimony during her hearing that her left arm is numb and that it tingles. The MRI, there's no objective finding on the MRI. The problem in this case is that she finally found a doctor, Dr. Phillips, who's saying despite having a very minimal bulge on the MRI and really nothing objectively wrong with her, you subjectively say you're in pain, so I'm going to go ahead and perform this surgery. That's the problem in this case. But the toothpaste is out of the tube at that point. He performs the surgery. And whether she's a liar or not wouldn't make a hill of beans difference in this case if every doctor said, you know what, if you have the three-disc cervical fusion, you're disabled and that's it. But that's not what they said. Dr. Phillips, her own surgeon, and Dr. Milgram said in theory, hypothetically, if you have this fusion and it goes well, you can return to work as a police officer, which completely throws the ball back over into the plaintiff's court to say does the pension board, should it believe the subjective complaints that she can't do the job and that she has pain? Well, based on this history of lying since 1996, the answer to that question is no. There is competent evidence to support the board's decision there. And did she recover from the fusion? Absolutely, Your Honors. 1999, Dr. Phillips says, significant improvement. 2000, no neurologic symptoms. 2001, plaintiff's fusion is absolutely solid. So then we come to these FCEs. Well, these FCEs, the functional capacity evaluations, find that they appear to be valid and that she can't return to work. But what is that based on? It's based on her subjective effort. Now, they say that objectively we believe that there's a valid effort, but is the pension board to believe this with a history going back to 1996 where subjective complaints don't match objective findings? And the plaintiff tried to relate her nose surgery in 1998 back to this 1996 injury. And she said that Dr. Kenai, that the first time he observed her for nasal problems was in 1998. That's patently false. That is incorrect and that is an attempt to relate her nose injury to that 1996 training exercise. Dr. Kenai's records and testimony show that in 1996 he first observed the plaintiff for a nose problem and that he actually set her up for surgery in March before the October 17th date. This plaintiff was diagnosed as a malingerer. Somebody who tailors their subjective complaints to obtain a beneficial monetary result. That's exactly what happened in this case. Dr. Johanna did. Dr. Tudor found that her credibility was suspect. Dr. Harris, even though he found her disabled, said that she was consciously deceptive. There's no question that she's not entitled to a psychiatric disability. Dr. Johanna, Obolsky, and Tudor all said that she's not mentally disabled. Even her own doctor, Dr. Johnson, wrote July 19, 2002 that she could return to work and then changed her opinion depending on what the plaintiff wants. There's plenty of evidence to support the board's decision in this case and then we go back to the active duty issue and I'll end on that. The active duty issue, that's just a conflict in the evidence, your honors. We have the plaintiff saying that she was injured when she was kicked and punched in the face. We have two live witnesses who gave testimony that contradicted that. Not only that, the evidence suggests that if somebody was injured during a training exercise, the fire department would be called and it actually was called on that date for a person who injured his finger. It wasn't called for the plaintiff in this case, which completely contradicts her assertion. And even if your honors reverse and find that she is entitled to a physical disability pension, it still doesn't matter. She's still not entitled to a line of duty disability because there's evidence in the record from three separate doctors who say that her physical disability is not the result of the injury she suffered October 17, 1996. What documentation is there for the alleged 1989 back injury? This is what it is. It was cited to in Dr. Blonsky's February 14, 2000 report at page 992 of the record and he cited to Dr. Rock's notation that the plaintiff was involved in a car accident in 1995, developed a neck and chest pain and was diagnosed with a diffuse cervical in the neck and thoracic dysfunction. The plaintiff did not object to the admission of Dr. Blonsky's report, did not depose Dr. Blonsky. It came into evidence. I'm not frankly myself, just in case the appellant wants to make an issue of that. I don't have a problem saying that hearsay becomes good evidence if it's not objected to.  Administrative agencies aren't necessarily bound to the full stricture of the rules of evidence as the courts might have been. I can tell you that from doing enough of these that if there was a contemporaneous hearsay objection, we'd stop the hearing and we'd go to an evidence deposition. That's what happens in these things. We still view it from the pension board's side as a valid objection. So there was the opportunity there. Whether she suffered a neck injury or prior neck injury, she says Dr. Rock's report is wrong, Dr. Blonsky's report is in evidence. She acknowledges that she was actually in the car accident. She just simply says, I didn't experience neck pain, as opposed to the document that says that it was there. It's a conflict in the evidence. It's the pension board who has to, it's within their province to weigh that evidence. So we think that there's evidence to support that position. Your Honors, I think that addresses all of my points on review. Thank you, Mr. Cooper. If there's nothing else, my client and I thank the Court very much for its time. Mr. Alter, a final word. First, with regards to the first issue, all I'm going to say is where there's smoke, there's fire. And I'm going to take that in conjunction with that issue, with the other issues that we have regarding the actual substance of the case. Regarding the allegations, again, I would submit that the allegations need to be supported by actual evidence. Allegations of malingering, allegations of credibility are not supported. Well, if there's a difference between an allegation and an evaluation, when you're talking when a psychiatrist or a psychologist is interviewing a claimant, a determination as to whether she's malingering may not be accurate, but it's a legitimate expert opinion, because that's what determines that is a legitimate basis upon which to make a determination as to credibility. There could be, of course, better determinants, such as objective evidence disproving the claim. But that doesn't necessarily prove malingering. It can only, it might just establish mistake. But the word malingerer means somebody who's consciously lying. And that's probably better ascertained through an interview than it is through objective determination, although obviously the best of all possible words would have both. But you can't simply say it's an allegation. It's an opinion. That opinion by Dr. Yohanna and his basis for it doesn't exist, though. He says that she contradicted, yet he wasn't able to point out one iota of evidence of what he was referring to was in contradiction. Her testimony about what happened was confirmed by all of the medical records. So him saying that his opinion that she's a malingerer is not supported by anything. He could say it. It doesn't mean it's true. There's no support for it. There's no support, no basis for that opinion. How can that opinion have any worth? There's no support. He says that it's based upon contradictions, yet there's no contradiction cited in his report that states, well, because of this and this and this, I find her to be a malingerer. He doesn't say that. He just says, I find her to be a malingerer because there's contradictions. He doesn't identify a single contradiction. Why? Because there are no contradictions. Every medical record reflects back to the October 1996 incident. No contradiction in that. With that, again, I would go back and submit that the only reliance regarding the physical disability that they are relying on is Dr. Mercier. They said, one, the opinion about the date being wrong is causation. Well, the causation opinion is worthless. Then also, please note, Dr. Mercier did not opine that she can go back to police work in his report. He said, speculatively, that if she undergoes a work hardening program, that she could return to police work. But based upon now, based upon her functional capacity evaluation, she currently now is not able to return to police work. But if she undergoes potentially this treatment, she may be able to return to police work. That is in Dr. Mercier's report. Even though he signs the certificate as not disabled, he puts in his report specifically that opinion. So for them to argue anything different is, again, against what the actual report states. And that's the only doctor that said she's not disabled. When you have the other two certify her as disabled, Dr. Milgram, Dr. Rosenblatt, and then the petitioner's treatment physician. How about Dr. Yohanna? Again, Dr. Yohanna was based upon a psychiatric examination. And I was referring just to the physical evaluation. Regarding the psychiatric examination, again, I would submit his opinion is worthless because there's no basis for his opinion. Just because he states it doesn't mean that it's true. He did not provide any basis for his predictions. There's no basis for the opinion. The opinion should have no worth. Again, that goes back to my whole theory about the manifest way to the evidence. Saying it doesn't make it true unless there's support for it. Unless you're an expert whose expertise takes you into the area of determining the affect of the interviewee and the signs, whether they're subtle or not, the interviewee is necessarily believes what she purports to be saying. Even an expert has to support their opinion. And he did not support his opinion. Well, he supported the interview. I'm sorry? The interview. But the interview doesn't, in his report, reflect anything that he would say that reflected that she was in any way malingering, lying, misleading, contradicting in any way. Again, saying it doesn't make it true. With that, I would ask Your Honor to review all the evidence in this case. And the manifest evidence will reveal that the decision of the Board was against the manifest evidence. And it would respectfully request that you award her an in-line-of-duty disability pension and or confirm the Circuit Court's decision to award her a disability pension and not in-line-of-duty. Thank you, Your Honor. I've got to tell both of you, this is among the best manifest way to the evidence arguments that I've seen. That's not telling you that anybody's going to win or lose, but the effort is a good one. I would reiterate that. Mr. Adler, Mr. Goodlow, it's seldom, well, not seldom, but your oral argument on both sides was superb. Your briefs are excellent. You have really helped illuminate the Court on a very interesting case. We thank you both. Your clients have been well served by your representation. We'll take a short